UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| DAVID CASTILLO,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br><br>Defendant. | Case No. 13-cv-01307-NJV<br><br>**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 16, 19 |

# INTRODUCTION

David Castillo seeks judicial review of an administrative law judge ("ALJ") decision denying his disability insurance (Title II) benefits. Doc. No. 16. Castillo's request for review of the administrative law judge's decision was denied by the Appeals Council. *See* Administrative Record ("AR") 1-3. The decision thus is the "final decision" of the Commissioner of Social Security, which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge. Doc. Nos. 4 & 18. The court therefore may decide the parties' cross-motions for summary judgment.

For the reasons stated below, the court will grant in part Castillo's motion for summary judgment, and will deny Defendant's motion for summary judgment.

# LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence

United States District Court
Northern District of California

1  as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108

2  F.3d 978, 979 (9th Cir. 1997).  "In determining whether the Commissioner's findings are

3  supported by substantial evidence," a district court must review the administrative record as a

4  whole, considering "both the evidence that supports and the evidence that detracts from the

5  Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  The

6  Commissioner's conclusion is upheld where evidence is susceptible to more than one rational

7  interpretation.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## DISCUSSION

9  **I.  EVIDENCE IN THE RECORD.**

10      **A.  Medical History.**

11          Castillo underwent lumbar surgeries in 1990 and 2002, as well as right shoulder surgery in

12  2004.  AR 318, 329, 381.  He was obese at all times relevant to this appeal.  AR 25.

13          On May 27, 2008, Castillo was injured when a warehouse door fell and landed on the back

14  of his neck and right shoulder.  AR 380.  Castillo filed a worker's compensation claim, which

15  covered the treatment for the injury to his right shoulder and provided him with disability benefits.

16  AR 82.  A magnetic resonance imaging ("MRI") study revealed hypertrophic degenerative

17  changes (enlargement of tissue) in Castillo's right shoulder and some fraying of the supraspinatus

18  tendon.  AR 344.  Castillo continued to work, but performed only light duty until September 2,

19  2008, at which time he underwent a surgical excision of his distal clavicle and acromioplasty

20  (debridement) of his right shoulder.  AR 345-46, 380, 457.  (Castillo's alleged onset date is

21  September 2, 2008.)  Castillo underwent physical therapy for his right shoulder, during which time

22  he began to have more neck pain.  AR 495.  An MRI of Castillo's cervical spine showed disc

23  herniation, posterior and to the left, at C5-C6.  AR 462, 495.

24          On September 15, 2008, Castillo presented to an emergency room for left shoulder pain.

25  AR 455-56.  He was informed that his worker's compensation claim did not cover pain in his left

26  shoulder.

27          Castillo's treating physician, Dr. Gaylon Seay, referred him to a pain specialist, Dr. Michel

28  Oliva.  Dr. Oliva saw Castillo on November 17, 2008.  AR 495.  Dr. Oliva's examination revealed

2

1   positive straight leg raises, hyper-reflexive deep tendon reflexes, and cervical pain.  AR 496 (pain

2   "radiates down the left side.  It follows the C6-C7 nerve root distribution which coincides with the

3   MRI findings").  Dr. Oliva assessed neck pain, greater on the left, upper extremity radiculopathy,

4   as well as left leg numbness; he found that "grip strength is significantly weak[;]" he

5   recommended cervical surgery.  *Id.*  A few days later, on November 21, 2008, Dr. Seay found that

6   Castillo had an "excellent range of motion," could easily raise his hand overhead, could touch the

7   back of his head, and had "no pain with movement" during the exam.  AR 338.  Despite noting the

8   progress in Castillo's right shoulder, Dr. Seay did not feel "secure at this point to refer the patient

9   for a [functional capacity evaluation] or a work conditioning program for his right shoulder when

10  he may have a significant abnormality that needs treatment in the cervical spine."  AR 338.

11       In January 2009, Castillo was examined by Stephen Van Roekel, D.O., who was selected

12  by the State agency in connection with Castillo's workers' compensation claim to conduct a

13  designated doctor evaluation.  AR 357-363.  Dr. Van Roekel noted supraspinatus muscular

14  atrophy, tenderness upon palpation of the cervical spine and lumbar spine, as well as muscle

15  spasms on the cervical spine.  AR 360.  Straight leg tests were negative.  Cervical range of motion

16  appeared decreased with full effort; lumbar and thoracic range of motion appeared within normal

17  limits.  *Id.*  Castillo's left triceps was atrophied and had an absent reflex.  *Id.*  His left bicep was

18  atrophied by 2 centimeters.  AR 361.  Dr. Van Roekel diagnosed cervical spine herniated disc with

19  radiculopathy; lumbar spine/strain; right shoulder surgery.  AR 362.

20       On February 29, 2009, Castillo underwent a C6-C7 discectomy and fusion.  AR 319-

21  20.  Castillo's surgeon released him "without restrictions" on March 30, 2009.  AR 333.

22  Dr. Seay examined Castillo on April 10, 2009, noted that Castillo reported "significant

23  improvement in his left arm pain," and noted that he had no pain with movement of his right

24  shoulder, could easily raise his hand overhead, had an excellent range of motion, but had notable

25  weakness.  AR 336.  Dr. Seay recommended a work-conditioning program, which had been

26  delayed by Castillo's cervical surgery.  AR 336-37.

27       On April 24, 2009, Dr. Seay examined Castillo's right shoulder and again found weakness.

28  AR 336.

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1      On May 19, 2009, Castillo presented to an emergency room with complaints of headache

2 behind his left ear, tingling on the left side of his face and his tongue, and nausea.  AR 352-53.

3      On May 26, 2009, Robert Whitsell, M.D., examined Castillo for another designated doctor

4 evaluation in connection with Castillo's workers' compensation claim.  AR 379-84.  Dr. Whitsell

5 reviewed Castillo's records for his cervical spine and right shoulder.  AR 381.  He observed a

6 limited range of motion in Castillo's cervical spine, "basically" normal range of motion in his

7 shoulders with discomfort, and decreased sensation and strength in his left hand.  AR 382-83.  He

8 also noted "slight atrophy" in the left bicep.  AR 383.  Dr. Whitsell did not examine Mr. Castillo's

9 lumbar spine, thoracic spine or lower extremities.  AR 382.

10      On June 3, 2009, Dr. Oliva noted that physical therapy had intensified Castillo's neck,

11 lumbar and thoracic pain.  AR 493.  Dr. Oliva observed hyper reflexive deep tendon reflexes and

12 tenderness to palpation in Castillo's lumbar, thoracic and cervical spinal regions, which intensified

13 with twisting, extension and bending.  *Id*.  The following week, Dr. Seay noted that Castillo's

14 physical therapist had found "significant atrophy in his lower right extremity and right foot drop."

15 AR 450.

16      On June 19, 2009, a state agency non-examining physician reviewed Castillo's records in

17 connection with his application for Social Security disability benefits.  Dr. Frederick Cremona

18 noted diagnoses of cervical disc herniation and fusion and right shoulder injury, which limited

19 Castillo to performing work at the medium exertional level.  AR 388.  Dr. Cremona noted that

20 there was no medical source statement regarding Castillo's physical capacities in the file.  AR 394.

21 Dr. Cremona's assessment was affirmed by Kelvin Samaratunga after Castillo requested the SSA

22 reconsider its decision.  AR 396.

23      Also on June 19, 2009, Dr. Douglas K. Smith interpreted an MRI of Castillo's lumbar

24 spine.  AR 485-86.  He found "marked" desiccation and loss of vertical height at L5-S1 (stenosis),

25 as well as right disc herniation with compression of the right S1 nerve root, and compression of

26 both L5 nerve roots in the neural foramen.  *Id*.  There were moderate to mild changes at all other

27 lumbar levels.  AR 485.  An MRI of Castillo's thoracic spine revealed mild to moderate foraminal

28 encroachment (stenosis) along the mid-thoracic spine related to degenerative factors.  AR 487.

Dr. Oliva recommended epidural injections in Castillo's lumbar spine and bilateral facet injections in his thoracic spine, noting that, in the past, these had been contradicted by Mr. Castillo's abnormal bleeding.  AR 491-92.

On February 22, 2010, Dr. Wayne Soignier examined Castillo for a third designated doctor evaluation in connection with Castillo's worker's compensation claim.  AR 501-03.  Dr. Soignier examined Castillo's shoulders and cervical spine (the "present injury"), noting a reduced range of motion in his right shoulder and decreased sensation, greater in his left hand.  AR 501-03.

On October 27, 2010, Dr. Oliva noted pain in Castillo's cervical and lower back and radiculopathy in his upper and lower extremities, and hyper reflexive deep tendon reflexes.  AR 507.  Dr. Oliva recommended conservative treatment, such as physical therapy, medications and a TENS unit, as well as facet injections and cervical epidural steroid injections.  *Id*.  Dr. Oliva indicated that Castillo had been given a status of maximum medical improvement ("MMI") and 10% disability, with which Dr. Oliva did not agree.  AR 507.  (This MMI report is not in the record.  The ALJ incorrectly identified this MMI report as Exhibit 22F in the AR.  Exhibit 22F was signed by Dr. Huston on December 8, 2011, finds that Castillo had a permanent impairment of 19%, and that Castillo had reached statutory MMI by September 6, 2010.  AR 519.)  Dr. Oliva opined that Castillo's low back pain, lower extremity radiculopathy, and thoracic pain also were related to his work injury.  *Id*.  Because Mr. Castillo had a chronic pain condition, Dr. Seay withdrew as his primary care physician.  *Id*.  Dr. Oliva recommended that Castillo choose Dr. Melissa K. Henry as his new primary care provider.  *Id*.

On April 5, 2011, Dr. Henry observed "very significant muscle atrophy" in Castillo's right leg and positive foot drop on the right, as well as pain to palpation in his lumbar spine and negative Waddell's testing.  AR 511.  Dr. Henry diagnosed lumbar strain, cervical strain, shoulder strain, and complete rupture of rotator cuff.  *Id*.  On May 12, 2011, Dr. Henry reviewed the MRI of Castillo's lumbar spine, noted "[p]ositive disc bulging at multiple levels but most severe at L5-S1 with right neural impingement," and indicated she would refer Castillo to a neurosurgeon for "L5-S1 herniation and right LE weakness."  AR 513-14.  She also limited Castillo to lifting, pushing, and pulling approximately 10 pounds, and restricted him from

5

United States District Court
Northern District of California

1    prolonged or excessive bending.  AR 514.  Dr. Henry noted that Castillo had been unable to

2    undergo the injections recommended by Dr. Oliva because of bleeding problems.  AR 513.  She

3    observed that Castillo's gait was antalgic (limited by pain) and his right leg was atrophied.  *Id.*

4         On May 12, 2011, Castillo visited Dr. Oliva for pain management.  AR 506.  According to

5    the ALJ, Dr. Oliva noted atrophy in the right leg.  AR 28.  (Dr. Oliva's notes are not legible to the

6    undersigned.)

7         In June 2011, Dr. Henry noted right lower extremity atrophy.  AR 515.  She also noted

8    limited range of motion with pain and "positive lumbar paraspinous pain."  *Id.*  She reiterated her

9    previous lifting, pushing and pulling restrictions to 10 pounds.  AR 516.

10        Dr. Henry transferred to a clinic that did not accept workers' compensation patients (AR

11   29, 65), and Castillo therefore began seeing another provider in Dr. Henry's former practice group,

12   Harrison Luna, PA-C.  On September 9, 2011, PA-C Luna examined Castillo and observed normal

13   but slow gait, symmetric reflexes, decreased range of motion, ability to squat and heel and toe

14   walk with pain, and tenderness of both paraspinous muscles at L2, L3, L4 and L5 with right

15   buttock radiation.  AR 517.  Straight leg raising was negative.  He assessed lumbar radiculopathy,

16   recommended no activity, and noted that Castillo's (unidentified) provider had taken him off

17   work.  AR 518.

18        On September 12, 2011, Dr. Oliva observed that Mr. Castillo exhibited significant range of

19   motion deficits and "severe excruciating intractable" pain in his lumbar and cervical spines, as

20   well as associated upper and lower extremity radiculopathy.  AR 505.  Dr. Oliva stated that all

21   conservative treatment modalities had been exhausted and recommended that Castillo use a cane

22   for ambulation.  AR 505.

23        On December 8, 2011, Dr. James W. Huston completed a workers' compensation form,

24   retroactively finding that Castillo had attained MMI on September 6, 2010, and certifying that

25   Castillo's compensable injuries resulted in a permanent impairment of 19%.  AR 519.

26   **B.  Testimony.**

27        The May 2010 hearing lasted 25 minutes.  AR 79, 95.  Castillo testified that he could not

28   return to work because of continuing pain in his lower back.  AR 84.  He experiences spasms and

there are times when his leg just gives out and he falls to the ground. AR 84. He experiences numbness in his right leg, as well as shooting pain and cramping; sitting or standing for long periods of time hurts very badly. AR 88. His left arm is weak and hurts; he can do dishes and cook dinner, but cannot vacuum or mow the law. AR 85. Castillo also clarified that while surgery helped with his right side pain, he continued to have pain and difficulty with his left side. AR 85-86. On a typical day, he feels pretty good when he gets out of bed, does the dishes, lays back down, then leaves the house around 11 am to "go do things"; he comes back and does the dishes then lays down for a bit; he gets up and finishes the dishes then lays back down; he grocery shops for a day or two so he does not have too much to carry; he takes his 14 year old daughter to the library; he prepares dinner then lays back down. AR 89-91. He lays down because it gives him relief from his back; he would be in excruciating pain if he could not lay down. AR 91.

As described below, the ALJ conducted a second hearing after the Appeals Council remanded the case for further proceedings. The February 2012 hearing lasted 32 minutes. AR 57, 76. Castillo testified that he stays at home approximately 90% of the time. AR 58. He usually gets up at 7:00 am and gives his daughter a ride to school, comes home and has coffee, then lays back down in bed and goes to sleep for a little while. AR 67. He can walk for five to fifteen minutes before he experiences shooting pain down his leg and he needs to rest; that is why he spends most of his time lying down and elevating his leg. AR 63. He needs to elevate his legs for six hours in an eight-hour day. AR 68. He was prescribed a cane for balance after he fell five or six times; his leg just gave out. AR 63, 69. He only fell a few times after starting to use the cane. AR 69. He has trouble gripping the cane; he uses his hand as a hook to carry groceries because he cannot really grab them. AR 67. His right leg is atrophied, and that is the leg that gives out mostly. AR 64. He can shop for one day's worth of groceries; the store clerks carry the groceries out of the store, and his daughter carries them into the house. AR 70. He cooks simple meals. *Id*. He takes his daughter to the library. AR 59. He went to watch the Super Bowl at a friend's house. AR 70.

## II. THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY.

A person filing a claim for social security disability benefits ("the claimant") bears the

1    burden of proving his disability.  20 C.F.R. § 404.1512(a).  The claimant must show that he has

2    the "inability to do any substantial gainful activity by reason of any medically determinable

3    physical or mental impairment" which has lasted or is expected to last for twelve or more months.

4    *Id*. § 404.1505.  The ALJ must consider all evidence in the claimant's case record to determine

5    disability (20 C.F.R. § 404.1520(a)(3)), and must use a five-step sequential evaluation to

6    determine whether the claimant is disabled (20 C.F.R. § 404.1520).  "[T]he ALJ has a special duty

7    to fully and fairly develop the record and to assure that the claimant's interests are considered."

8    *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

9         Here, the ALJ evaluated Castillo's application for benefits under the required five-step

10   sequential evaluation (AR 23-36):

11        At Step One, the claimant bears the burden of showing he has not been engaged in

12   "substantial gainful activity" since the alleged date the claimant became disabled.  20 C.F.R.

13   § 404.1520(b).  If the claimant has worked and the work is found to be substantial gainful activity,

14   the claimant will be found not disabled.  *Id*.  In his second decision, the ALJ found that Castillo

15   had not engaged in substantial gainful activity since that date.  AR 24.

16        At Step Two, the claimant bears the burden of showing that he has a medically severe

17   impairment or combination of impairments.  20 C.F.R. § 404.1520(c).  A "severe" impairment is

18   one defined as significantly limiting physical or mental ability to do basic work activity.  *Id*.  The

19   ALJ found that Castillo had multiple severe impairments: he was obese; had degenerative changes

20   in his lumbosacral spine after two surgical procedures; and he underwent a one-level anterior

21   cervical discectomy and fusion and two right dominant shoulder procedures.  AR 24.

22        At Step Three, the ALJ compares the claimant's impairments to a listing of impairments in

23   20 C.F.R. pt. 404, subpt. P, app. 1.  *See* 20 C.F.R. § 404.1520(d).  The claimant bears the burden

24   of showing his impairments meet or equal an impairment in the listing.  *Id*.  If the claimant is

25   successful, a disability is presumed and benefits are awarded.  *Id*.  If the claimant is unsuccessful,

26   the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four.

27   20 C.F.R. § 404.1520(e).  Here, the ALJ found that Castillo did not have an impairment or

28   combination of impairments that met or medically equaled one of the listed impairments.  AR 24-

United States District Court
Northern District of California

8

29.  The ALJ evaluated whether Castillo met the impairments listed at Section 1.04 (Spinal Impairment), and Section 1.02 (Shoulder Impairment).  However, because Castillo did not exhibit the requisite neurological deficits consistently or for a period of 12 months, the ALJ found he did not meet the listing for Section 1.04; because Castillo could perform fine and gross movements effectively, the ALJ found he did not meet the listing for Section 1.02.  AR 25.  The ALJ also found that Castillo's combination of impairments, including his obesity, did not meet or equal one of the listed impairments.  The ALJ accordingly found that Castillo was not entitled to a presumption of disability and proceeded to analyze Castillo's RFC.  While the ALJ found that Castillo had objectively identifiable, medically determinable impairments that reasonably could have expected to produce the pain and other subjective complaints Castillo alleged, the ALJ found that Castillo's allegations regarding the level of pain and complaints was not fully credible.  AR 29.  After discounting Castillo's reports of pain and subjective complaints, the ALJ found that Castillo could perform light work, with some limitations.  AR 33-34.

At Step Four, the claimant bears the burden of showing he does not have sufficient RFC to perform past relevant work due to his impairments and/or limitations.  20 C.F.R. § 404.1520(e).  Because Castillo's past relevant employment was performed at levels above the light exertional level, the ALJ found that Castillo was unable to perform past relevant work.  AR 34.

At Step Five, the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience.  20 C.F.R. § 404.1520(f).  In Castillo's case, the ALJ relied on the testimony of a vocational expert to determine that Castillo could perform a number of jobs that were available in sufficient numbers in the local or national economy.  AR 35.  Accordingly, the ALJ found that Castillo was not disabled during the relevant period.  *Id.*  (The relevant period is September 2, 2008 through September 30, 2011, Castillo's last-insured date.  AR 229.)

### III. PLAINTIFF'S ARGUMENTS ON APPEAL.

Plaintiff argues that the ALJ's decision should be reversed on two grounds.  Doc. No. 16.  First, he argues that the ALJ failed to fully and fairly develop the record.  Second, he contends that

9

the ALJ legally erred by failing to make specific clear and convincing credibility findings.

Plaintiff contends that his case should be reversed with an order for immediate payment of

benefits, or in the alternative, reversed and remanded for further development of the record.

**IV. ANALYSIS.**

    **A.  The ALJ Failed To Develop The Record.**

        **1.  The first ALJ decision.**

        To determine whether Castillo's impairments met or equaled a listed impairment, the ALJ

was to "consider" the opinion of the State agency evaluator.  AR 102.  While the ALJ did consider

the opinion of the State agency evaluator, the evaluator only reviewed 4 exhibits in the medical

record, the latest of which was received by the SSA on June 11, 2009.  Based on his review of the

4 exhibits, the State agency evaluator determined that Castillo's condition was "not severe enough

to keep [him] from working."  AR 121 (undated Explanation of Determination) & AR 314-355

(Exs. 1F-4F); *see also* AR 127 (upholding conclusion at reconsideration level, after reviewing

evidence supplied by Castillo's counsel) & AR 356-372 (Ex. 5F (attorney-supplied records from

2008 through January 19, 2009)).  The evaluator reviewed the medical records relating to

Castillo's "back injury and weakness in [] neck, arms, back & legs."  AR 121; *see also* AR 127

("back injury with joint pain").

        The ALJ reviewed additional medical records for Castillo dated through February 2010,

including MRI studies from June 2009, Dr. Oliva's September 2009 evaluation, and Dr. Soignier's

February 2010 designated doctor examination.  The ALJ reviewed these additional records

without the benefit of the evaluator's review of those additional records.  *See* AR 104.

        The ALJ also secured the opinion of a State agency medical consultant to evaluate

Castillo's RFC.  AR 102.  That consultant, Dr. Cremona, evaluated Castillo's RFC only with

respect to his cervical disk herniation & fusion, and his right shoulder injury.  AR 388-394.  While

Dr. Cremona did not explicitly state which records he reviewed, the ALJ noted that the consultant

did not have access to the "updated medical evidence."  AR 102, 388-96 (RFC evaluation dated

June 19, 2009; last medical record mentioned is dated May 26, 2009).

        During the first hearing before the ALJ, Castillo's attorney argued that Castillo met the

listing for 1.04A because an MRI study showed nerve root compression and impingement, and that in November 2008, he had a positive straight leg raising test. AR 80. The ALJ did not address this evidence specifically, and only stated that Castillo did not meet Listing 1.04 as to his spinal impairment because Castillo "had not exhibited the requisite neurological deficits for a continuous twelve-month period." AR 102. The ALJ acknowledged that Castillo "began to voice significant complaints as to his lumbar spine in June 2009, and has abnormalities in his lumbar spine that can account for his symptoms." AR 107. However, because Dr. Oliva had not noted any radicular deficits despite Castillo's complaint, and only one health care provider noted Castillo's lower extremity atrophy and right foot drop, the ALJ found that Castillo's complaints were not fully credible. *Id*. He found that Castillo could perform the full range of light work, except was limited to only occasional overhead work. *Id*. Thus, Castillo was not disabled. AR 108.

### 2. The second ALJ decision.

In his second decision, the ALJ found "the credible evidence supports the findings of the State agency medical consultants that the severity of the claimant's impairments did not meet or equal any of the listed impairments at Appendix 1. In reaching my determination, I considered Section 1.04 as to his spinal impairment, but he did not exhibit the requisite neurological deficits consistently or for a continuous twelve-month period…." AR 25. (This language is identical to the language the ALJ used in his first decision, issued two years earlier.)

During the second hearing, Castillo's attorney recognized that the lack of positive straight leg raising prevented Castillo from meeting the Listing 1.04A, but argued that Castillo "has everything except that" to meet Listing 1.04A: "and with the combination of his other impairments, the neck, the shoulder, the thoracic spine if he might not equal the listing or be less than sedentary." AR 71. Specifically, the attorney directed the ALJ to the MRI studies and Dr. Henry's findings of limited range of motion and muscle atrophy. *Id*.

The ALJ did not ask any medical expert to assess the voluminous medical evidence received after June 11, 2009, or the medical evidence received after he issued his first decision. *See* Doc. No. 16 at 14 ("no Agency medical expert examined Mr. Castillo or reviewed his records

United States District Court
Northern District of California

covering the two years between June 2009 and September 2011").  Specifically, no medical expert evaluated Dr. Smith's interpretation of the MRI study of Castillo's lumbar spine (AR 485-86); Dr. Soignier's February 2010 examination (AR 501-03); Dr. Oliva's notes from October 2010, May 2011, or September 2011; *any* of Dr. Henry's examination notes; PA-C Luna's notes from September 2011; or, Dr. Huston's December 2011 notes.  Only the ALJ evaluated these records in order to determine whether Castillo's impairments met or equaled a listed impairment.  Defendant argues that no medical expert was required because "the ALJ clearly did not have the opinion that the additional medical evidence would change the opinion of the state agency reviewing physicians regarding equivalency."  Doc. No. 19 at 7.  The court notes that the ALJ did not articulate that opinion in his second decision.  *See* AR 24-25.

### 3.    The requirements of SSR 96-6p.

Both parties rely on Social Security Ruling ("SSR") 96-6p in making their arguments.[1] The Social Security Administration ("SSA") issued this Policy Interpretation Ruling to clarify the responsibility of ALJs for "obtaining opinions of physicians . . . designated by the Commissioner regarding equivalence to listings in the Listing of Impairments[.]  In particular, to emphasize the following longstanding policies and policy interpretations: . . .  An updated medical expert opinion must be obtained by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence can be made."  *Id*.  In relevant part, the Policy Interpretation Ruling states:

> The administrative law judge or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled. As trier of the facts, an administrative law judge or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments. However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be

[1] Although Social Security Rulings do not have the force of law, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

United States District Court
Northern District of California

received into the record as expert opinion evidence and given appropriate weight.

The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review….

When an administrative law judge or the Appeals Council finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical . . . consultant. However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert [when] additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

When an updated medical judgment as to medical equivalence is required at the administrative law judge level in either of the circumstances above, the administrative law judge must call on a medical expert.

### 4. Pursuant to SSR 96-6p, the ALJ should have obtained an updated medical evaluation regarding equivalency.

The ALJ had an independent "'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)).  Disability hearings are not adversarial in nature.  *See Sims v. Apfel*, 530 U.S. 103, 111 (2000).  In an administrative hearing, the ALJ must "look[] fully into the issues."  20 C.F.R. § 416.1444.  As part of this duty, the ALJ had an obligation to take reasonable steps to ensure that issues and questions raised by medical evidence in the AR were addressed so that the disability determination was fairly made on a sufficient record of information, both favorable and unfavorable to the claimant.  *See Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999).  The ALJ could not substitute his own interpretation of medical evidence for the opinion of medical professionals.  *See Tackett v. Apfel*, 180 F.3d 1094, 1102-03 (9th Cir. 1999); *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").

United States District Court
Northern District of California

13

1   Numerous medical records from different physicians document Castillo's impairments

2   relating to his lumbar spine, left arm, and lower extremity impairments between June 2009 and

3   September 2011, and provide objective support for Castillo's reports of pain and other subjective

4   complaints.  For example, Castillo obtained two MRI studies in June 2009; one of the studies

5   showed "marked" desiccation and loss of vertical height at L5-S1 (stenosis), as well as right disc

6   herniation with compression of the right S1 nerve root, and compression of both L5 nerve roots in

7   the neural foramen.  AR 485-86.  The ALJ mentioned these MRI studies in his decisions, but no

8   agency evaluator ever reviewed the studies.  Dr. Soignier found decreased sensation in Castillo's

9   hands in February 2010.  AR 502-03.  Again, the ALJ acknowledged this examination finding but

10   no agency evaluator considered it.  In October 2010, Dr. Oliva found Castillo evidenced

11   radiculopathy and had hyper reflexive tendon reflexes.  AR 507.  No agency evaluator considered

12   this evidence.  In 2011, Dr. Henry repeatedly observed significant muscle atrophy in Castillo's

13   right leg, along with foot drop.  AR 511.  No agency evaluator considered this evidence.  Also in

14   2011, Dr. Oliva observed radiculopathy, severe excruciating intractable pain, lower extremity

15   radiculopathy, and "significant range of motion deficits;" he recommended that Castillo use a cane

16   for ambulation.  AR 505.  No agency evaluator considered this evidence.  The ALJ also did not

17   order a consultative examination of Castillo.

18   In order to reach his conclusion that Castillo did not meet or equal a listed impairment, the

19   ALJ evaluated the voluminous medical evidence after June 11, 2009 himself, without the benefit

20   of an agency consultant's review.  The ALJ determined that Castillo did not meet or equal any of

21   the listed impairments because he did not "exhibit the requisite neurological deficits consistently

22   or for a continuous twelve-month period."  AR 25.  The ALJ first evaluated whether Castillo's

23   impairments met or equaled Listing 1.04 (Disorders of the Spine).  In order to *meet* a condition

24   listed at 1.04A, Castillo must show that his spinal disorder "results in compromise of a nerve root

25   (including the cauda equina) or the spinal cord," with, as is relevant here:

26   A. Evidence of nerve root compression characterized by
    neuro-anatomic distribution of pain, limitation of motion of the
27   spine, motor loss (atrophy with associated muscle weakness or
    muscle weakness) accompanied by sensory or reflex loss and, if
28   there is involvement of the lower back, positive straight-leg raising

United States District Court
Northern District of California

14

test (sitting and supine)[.]

The evidence summarized above establishes that Castillo's treaters repeatedly noted the presence of "nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." *See* AR 450 (6/10/09: therapy feels Castillo has significant atrophy in right leg and a right foot drop), 485-86 (6/18/09: mild dessication in L1-L3, moderate dessication in L3-5, marked dessication in L5-S1; disc herniation with compression of nerve roots), 493 (6/3/09: deep tendon reflexes are hyper reflexic; thoracic facet injections to calm pain are "medically indicated and medically necessary"), 501-504 (2/22/10: right shoulder has reduced range of motion; decreased sensation, greater in left hand"), 507-08 (10/27/10: tenderness to palpation, extremity radiculopathy, deep tendon reflexes are hyperreflexive, but no muscle wasting noted), 511 (4/5/11: right leg with very significant muscle atrophy; positive foot drop on right), 506 (5/12/11: right leg atrophy), 513-16 (5/12/11: gait antalgic, right leg atrophied compared to left leg; MRI shows positive disc bulging at multiple levels most severe at L5-SI with right neural impingement), 505 (9/12/11: extremity radiculopathy with most pain near lumbar spine; significant ROM deficits; exhausted all conservative modalities), 515 (6/9/11: positive right leg atrophy, gait normal), 517 (9/9/11: normal gait but slow; decreased ROM; able to touch knees, squat, and heel toe walk, with pain).  However, as his counsel conceded (AR 71), Castillo did not consistently test positive on straight-leg raising tests:  Dr. Oliva noted positive results in November 2008, Dr. Henry noted negative results in May 2011, and PA Luna noted negative results in September 2011.  *See* AR 496 (11/17/08), 513 (5/12/11), 517 (9/9/11).

Thus, there was substantial evidence to support the ALJ's finding that Castillo did not "meet" the requirements of Listing 1.04A.  However, the ALJ did not determine whether the evidence established that Castillo's condition (alone or in combination) "equaled" Listing 1.04A.  This was error: "in determining whether a claimant equals a listing . . . the ALJ must explain adequately his evaluation of alternative tests and the combined effects of the impairments. . . . [T]he statement that [a claimant] did not equal the listing was insufficient." *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990) (remanding for proper consideration of medical equivalence);

United States District Court
Northern District of California

15

*see also Murphy v. Comm'r of Soc. Sec. Admin.*, 423 Fed. Appx. 703, 704 (9th Cir. 2011) (ALJ (incorrectly) summarizing doctor's testimony that "claimant did not have any other impairment or combination of impairments that 'meets' or 'medically equals' the requirements of the impairments listed" was insufficient explanation of equivalence in decision under *Marcia*); *cf. Branch v. Astrue*, 2008 U.S. Dist. LEXIS 63155, at *9 (N.D. Cal. Aug. 4, 2008) (where the ALJ had "merely listed the criteria under Listing 1.04(A) and made a cursory finding that plaintiff does not meet each element of the listing," the court directed the ALJ on remand to "discuss whether plaintiff's evidence is sufficient to show that he meets Listing 1.04(A)).  Here, although Castillo's counsel argued at the hearing that the combination of Castillo's documented impairments ("the neck, the shoulder, the thoracic spine") equaled the listing, the ALJ made no findings as to whether they did.  Nor did the ALJ make any findings as to whether the documented neurological deficits that Castillo exhibited were of equal significance to the positive straight-leg raising test that is required to meet Listing 1.04A.  Indeed, it is difficult to imagine that an ALJ would be qualified to make that finding where no medical professional had opined about these issues.  The ALJ merely copied the cursory finding from his first decision that "the credible evidence supports the findings of the State agency medical consultants that the severity of the claimant's impairments did not meet or equal any of the listed impairments at Appendix 1.  In reaching my determination, I considered Section 1.04 as to his spinal impairment, but he did not exhibit the requisite neurological deficits consistently or for a continuous twelve-month period."  AR 25.  Not only was this explanation of equivalence insufficient under *Marcia*, but, as explained above, the "State agency medical consultants" on whose opinion the ALJ relied did not evaluate Castillo's later medical records.  The court concurs with Plaintiff that the ALJ's opinion regarding the lack of medical equivalence "has absolutely no medical foundation for any period after August 2009, [and] represents an improper substitution of the ALJ's lay judgment for that of the medical experts."  Doc. No. 16 at 14.

The record, including Castillo's own testimony, establishes that the symptoms associated with Castillo's  right shoulder injury improved after cervical surgery in 2008, but that new symptoms appeared subsequently, which affected his lumbar region, left side, and lower

1    extremities.  In light of the many new medical records, most of which documented new objective

2    impairments and supported Castillo's complaints, the ALJ should have obtained an updated

3    opinion as to medical equivalence.  *See* SSR 96-6p.  The court rejects Defendant's argument that

4    "clearly," the ALJ "did not have the opinion that the additional medical evidence would change

5    the opinion of the state agency reviewing physicians regarding equivalency" (Doc. No. 19 at 7) for

6    several reasons.  First, it is circular.  Second, it is unsupported by the record and constitutes

7    impermissible *post-hoc* rationalization.  *See Bray v. Comm'r of Social Sec.*, 554 F.3d 1219, 1225-

8    26 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's

9    decision based on the reasoning and factual findings offered by the ALJ -- not *post hoc*

10   rationalizations that  attempt to intuit what the adjudicator may have been thinking") (citing *SEC*

11   *v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  Third, given that the additional medical evidence

12   related to Castillo's lumbar region, lower extremities, and left side (as opposed to the evidence

13   relating to Castillo's cervical region and right arm that agency evaluators reviewed in 2009) and

14   supports Castillo's subjective complaints, the argument is not well-taken.

15          The ALJ erred in failing to develop the record by submitting the post-June 2009 medical

16   evidence to a State agency evaluator for purposes of determining whether Castillo's conditions

17   met or equaled a listed impairment.

18   **B. The ALJ Failed To Make "Clear and Convincing" Credibility Findings.**

19          To determine whether a claimant's testimony regarding subjective pain or symptoms is

20   credible, the ALJ must first find whether the claimant's condition could reasonably be expected to

21   produce the pain or other symptoms alleged.  *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th

22   Cir. 2007).  If the condition could reasonably be expected to produce the pain or other symptoms

23   alleged, the ALJ can reject the claimant's testimony about the severity of his symptoms "only by

24   offering specific, clear and convincing reasons for doing so."  *Smolen*, 80 F.3d at 1281.  Having

25   found that Castillo's condition could reasonably be expected to produce the pain and symptoms

26   alleged (AR 29), the ALJ was required to provide clear and convincing reasons for discrediting

27   Castillo's subjective complaints.

28          After summarizing in detail Castillo's testimony at both hearings (AR 30-32), the ALJ

United States District Court
Northern District of California

17

opined that "neither the objective medical evidence, the claimant's allegations, nor the other non-medical evidence establishes the claimant is so limited as to be found disabled.  I note the claimant was capable of a wide range of daily activities, per his testimony and Exhibit 4E."  AR 32; *see also* AR 33 (there was no "objective evidence" to support Castillo's allegations of radicular symptoms, and that Castillo "complained of a wide variety of symptoms, many of which were not documented on his physical examinations").  The ALJ proceeded to articulate several "clear" reasons why he discounted Castillo's testimony, but the reasons are not convincing.

      1.   **Several of the ALJ's reasons for discrediting Castillo's testimony are based on a misinterpretation of the factual record.**

The evidence in the AR does not establish that the claimant was "capable of a wide range of daily activities" (AR 32).  Setting aside that the ALJ did not sufficiently identify which activities he used to make this finding, the record establishes that Castillo was extremely limited in his daily activities.  *See supra* (could do dishes by resting numerous times; left house to drive his daughter to school or go to library or grocery store; bought groceries every day because could not handle carrying more at one time; spent 6 hours during day in bed).  Defendant argues that in Exhibit 4E, cited by the ALJ, "Plaintiff reported he engaged in a wide range of daily activities: He drove his daughter to and from school; helped his daughter with her homework; drove to and from and took part in therapy for three hours; prepared and cooked meals, including complete meals for dinner; played with and taught his daughter sports, including fishing and gold; went on long drives with his daughter; did housework, including vacuuming, cleaned his house and washed clothes; and shopped almost daily.  AR 268-270."  *See* Doc. No. 19 at 4.

Defendant's characterization of Exhibit 4E is incorrect.  In Exhibit 4E, Castillo explained that "play[ing]/teach[ing] daughter sports, play[ing] golf, fish[ing], tak[ing] long drives" were activities that Castillo was "able to do before [his] injuries, *that [he] can't do now*."  AR 269 (emphasis added); *see also* AR 272 (identifying hobbies and interests, but explaining that activities outside are limited because his hands and arms are weak and his hands tingle).  Similarly, although he still cooked meals in May 2009 when he completed Exhibit 4E, Castillo made clear that since his injury, he must take "long breaks" because of weakness and that on some

18

1    days he is too tired and in too much pain to cook.  AR 270.  In May 2009, he could still vacuum

2    and do laundry with the help of his daughter.  AR 270, 275.  By the following year, he could no

3    longer vacuum.  AR 85.

4         Those limited activities of daily living by Castillo that the ALJ relies upon that are

5    supported by the AR, are not a sufficient basis for rejecting Castillo's testimony.  *See Cooper v.*

6    *Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (evidence that claimant could assist with household

7    chores was not determinative of disability; a claimant need not "vegetate in a dark room excluded

8    from all forms of human and social activity" to be unable to engage in substantial gainful activity);

9    *see also Smolen*, 80 F.3d at 1284 n.7 ("[M]any  home activities may not be easily transferable to a

10   work environment where it might be impossible to rest periodically or take medication") (internal

11   citation omitted).

12        The ALJ also concluded that there was no objective evidence to support much of Castillo's

13   testimony about his pain and symptoms.  However, this conclusion is based on the ALJ's incorrect

14   interpretation of the AR.  For example, the ALJ found that "[a]lthough a report in June 2009 [by

15   Dr. Seay] stated the therapist noted lower right extremity atrophy and foot drop, no physician or

16   other health care provider verified those abnormalities."  AR 32.  In fact, two other treating

17   physicians observed those abnormalities independently.  In April 2011, Dr. Henry observed "very

18   significant muscle atrophy" in Castillo's right leg and positive foot drop.  AR 511.  In May 2011,

19   Dr. Oliva noted atrophy in the right leg.  AR 28.  In June 2011, Dr. Henry again noted lower

20   extremity atrophy.  AR 515.  As described further below, the ALJ also found that there was no

21   "objective medical evidence" supporting Plaintiff's complaints of left lower extremity

22   radiculopathy (AR 33), when Dr. Oliva specifically noted lower extremity radiculopathy on

23   separate visits.  The ALJ also found no evidence that Castillo had balance difficulties, but did not

24   acknowledge that Dr. Oliva prescribed a can for Castillo to use "for ambulation."

25        The ALJ's conclusion that Castillo's testimony was not supported by objective medical

26   evidence and/or was inconsistent with his claimed pain and symptoms testimony therefore is

27   premised on a misinterpretation of the AR and thus not based on substantial evidence.

28

United States District Court
Northern District of California

19

United States District Court
Northern District of California

### 2. The ALJ failed to explain why he did not give controlling weight to the opinions of Castillo's treating physicians.

The ALJ also discounted Castillo's testimony because it was not consistent with the objective medical evidence.  AR 33.  First, this is not a legally sufficient basis for discounting the testimony.  *See Reddick*, 157 F.3d at 722 ("Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence").  Second, this assessment is factually incorrect: Castillo's testimony is supported by the opinions of his treaters.  Dr. Smith found "marked" desiccation and loss of vertical height at L5-S1; disc herniation with compression of the right S1 nerve root; compression of both L5 nerve roots; and moderate to mild changes at all other lumbar levels.  Dr. Henry repeatedly observed significant atrophy and foot drop and bulging at multiple levels of Castillo's lumbar spine; she referred Castillo to a neurosurgeon for "L5-S1 herniation and right [lower extremity] weakness"; and she limited Castillo to lifting, pushing and pulling 10 pounds.  Dr. Oliva observed Castillo's pain and atrophy, diagnosed hyper reflexive tendons and radiculopathy in the upper and lower extremities, recommended that Castillo use a cane, and observed significant range of motion deficits; he concluded that they had exhausted all conservative treatment modalities.  PA-C Luna also found decreased range of motion, ability to walk with pain, and tenderness.  There are no medical opinions in the record contradicting the opinions by Castillo's treaters that Castillo had atrophy, pain, and decreased range of motion; there are no medical opinions in the record contradicting Dr. Oliva's findings that Castillo had lower extremity lumbar radiculopathy.

The ALJ could only reach the conclusion that Castillo's testimony was not supported by objective medical evidence in the record by also discounting the opinion of each physician who treated Castillo starting in June 2009.  For example, the ALJ opined that Castillo "was capable of independent ambulation without a cane, and there was essentially no evidence of the balance difficulties he described."  *Id*.  But the ALJ neither acknowledged Dr. Oliva's recommendation that Castillo use a cane nor explained why he rejected the recommendation.  Similarly, the ALJ stated that there was "no objective evidence to support [Castillo's] allegations of radicular symptoms to his left lower extremity" (AR 33) when Dr. Oliva on two separate occasions

20

1    observed lower extremity radiculopathy without limiting it to one side of the body (AR 505, 507).

2    The ALJ also dismissed Dr. Henry's opinion that Castillo should be limited to lifting and carrying

3    ten pounds because she was "not a specialist, [] did not have a longstanding treating relationship

4    with the claimant[;]" did not consistently report "the same abnormalities or neurological deficits"

5    upon examining Castillo; and that there were inconsistencies in some of her reports or findings.

6    AR 33-34.  He found instead that Castillo "could lift and carry up to twenty pounds occasionally

7    but only ten pounds frequently."  AR 34.

8         In determining what weight to give a medical opinion, the ALJ should have given the

9    opinions of Castillo's treating physicians controlling weight if they were "well-supported by

10   medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

11   other substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); 20 C.F.R. §

12   404.1527(d)(2) (if a treating physician's opinion is "well-supported by medically acceptable

13   clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

14   evidence in [the] case record, [it will be given] controlling weight").  "If there is 'substantial

15   evidence' in the record contradicting the opinion of the treating physician, the opinion of the

16   treating physician is no longer entitled to 'controlling weight.' 20 C.F.R. § 404.1527(d)(2). In that

17   event, the ALJ is instructed by § 404.1527(d)(2) to consider the factors listed in § 404.1527(d)(2)-

18   (6) in determining what weight to accord the opinion of the treating physician." *Orn*, 495 F.3d at

19   632.  These factors include the "[l]ength of the treatment relationship and the frequency of

20   examination" by the treating physician; the "nature and extent of the treatment relationship"

21   between the patient and the treating physician. *Id*. (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

22   Here, the ALJ determined that Castillo's treaters should not be afforded controlling weight, but

23   never explained whether or how the treaters' opinions were not "well-supported by medically

24   acceptable clinical and laboratory diagnostic techniques;" nor did the ALJ explain whether or how

25   the treaters' opinions were "inconsistent with the other substantial evidence in the case record."

26   AR 33.  (The SSA evaluator's "explanation of determination" and Dr. Cremona's assessment

27   predate the treaters' later findings and do not pertain to the same injuries or impairments.)   This

28   was not harmless error, as Drs. Oliva and Henry's opinions regarding Castillo's impairments and

United States District Court
Northern District of California

21

the impact on Castillo due to those impairments were consistent with each other and with other substantial evidence in the record after June 2009.  The ALJ's failure to apply the proper analysis in determining whether Drs. Oliva and Henry were entitled to controlling weight was error.

## CONCLUSION

The court is mindful that Castillo applied for disability benefits almost five years ago and requests that the court remand the case with an order to pay him benefits.  Unfortunately, the court finds that further development and evaluation of the record is necessary.  The court accordingly grants Castillo's motion for summary judgment in part and remands the case to the SSA for further proceedings consistent with this order.  Upon remand, the ALJ shall provide all of Castillo's medical records to an SSA medical expert in order to determine whether Castillo meets or equals one of the listed impairments.  If Castillo is found not to meet or equal a listed impairment, the ALJ shall continue the disability evaluation, and shall request that the SSA medical expert evaluate Castillo's RFC.  If the ALJ discounts Castillo's testimony, he must offer clear and convincing reasons, supported by the evidence in the AR, for doing so.  If the ALJ chooses not to give the opinions of Castillo's treating physicians controlling weight, he must explain why the opinions of the treaters are not well supported by medically acceptable techniques, and how they are inconsistent with other substantial evidence.

The court denies Defendant's cross-motion for summary judgment.

The Clerk of the Court is directed to close the case.

**IT IS SO ORDERED**.

Dated: March 11, 2014

_____
NANDOR J. VADAS
United States Magistrate Judge

United States District Court
Northern District of California

22